### DINTRUFF *v.* ROCHESTER CITY & B. R. Co.

*(Supreme Court, General Term, Fifth Department. June 20, 1890.)*

HORSE AND STREET RAILROADS—NEGLIGENCE.

Evidence that the driver of defendant's horse-car would have been able to control the horses, and thus to prevent an accident, but for the fact that the rear brake had been mischievously interfered with by boys; that the usual mode of preventing

such interference, the liability to which was matter of common knowledge to all, familiar with the operation of the cars, was by tying the brake down; and that defendant's superintendent knew that the brake of that particular car had been tied down at one time to prevent such interference,—is sufficient to show negligence on defendant's part.

Appeal from circuit court, Monroe county.

Action by George Dintruff against the Rochester City & Brighton Railroad Company. Judgment on verdict for plaintiff, defendant's motion for new trial denied, and it appeals.

Argued before DWIGHT, P. J., and MACOMBER and CORLETT, JJ.

*Raines Bros.*, for appellant.     *Walter S. Hubbell*, for respondent.

MACOMBER, J. The injuries to the plaintiff, for which this action is brought, were sustained at 8:30 o'clock in the evening of August 31, 1888, on State street, in the city of Rochester. A presidential campaign club of the Ninth ward was marching, at this time, southward on State street, towards the center of the town, carrying colored lamps, preceded by a band of music. Following immediately behind the torch-bearers was a company of mounted men; and these, in turn, were followed by the residue of the club on foot. Near the corner of Jay street the procession was welcomed by the firing of Roman candles by people ahead, which caused the horses attached to the defendant's car to plunge violently, and to run. The plaintiff, a lad of nine years of age at that time, who was with the crowd of people on the west side of the street, attempted to go across the street-car tracks to the east side of the street, away from the crowd, so as to get a better view of the parade, crossing the track ahead of the band. In the mean time the persons in the procession, apprehending injury from the horses or the car, moved away from the tracks so as to escape any collision. The horses drawing the car plunged forward, striking the boy, and throwing him down, and the car-wheel so lacerated his foot as to maim him for life; for which injuries the jury rendered a verdict for the sum of $2,000.

Very little need be said of the case, so far as the same relates to the charge that the negligence of the boy contributed to the production of the injuries which he received. There was, apparently, credible evidence, not to say uncontroverted testimony, that the boy not only did not see the runaway team and car, but that he could not, with the exercise of reasonable care, have discovered their approach, before the instant of the collision. There is a suggestion of testimony that, in passing the tracks, he did not go across at right angles, but ran for a distance along them for a space of 150 feet or thereabout. But this evidence, as it appears in the case, even if it is not a mistake in proof-reading, is wholly inconsistent with the facts which the jury was warranted in believing to exist, namely, that the boy did not imperil his own safety by walking any considerable distance upon the railway of the defendant.

The omission of duty on the part of the defendant towards the plaintiff and others is not made in the least doubtful by the evidence. The car in question was a double-end car, designed to be drawn by two horses, with both a driver and a conductor. The steps at one end thereof were removed, and the car converted into what is commonly spoken of as a "bob-tail," namely, a car without a conductor, and one where the collection of fares is made by the deposit of the fare by each passenger, in his own behalf, into the box, or into a metallic conveyor running the whole length of the car to the box. As originally constructed, there was a brake-handle at each end of the car, connecting the same with the brake, so that when one brake-handle is turned the slack in the chain is taken up, which prevents the brake from being applied at the other end of the car. A short time before the collision, some mischievous boys, who were catching rides on the rear platform, either intentionally or thoughtlessly turned the rear handle of the brake so that the brake

would not work; and, when the driver attempted to stop the running team by applying the brake at his end of the car, he found that the same would not work, and consequently he was utterly powerless to control the car. · Except for this, the evidence would have warranted the jury in saying that, however frightened the horses may have been by the band, and by the pyrotechnics, they could have been controlled, and that no injury to pedestrians would have happened. But the brakes were not in good order. This neutralization of the power of the front brakes was a matter well known, not only to the drivers, but to the officers of the company. It was common knowledge to all familiar with the operation of these cars that frolicsome boys might actually turn the rear brake, and thus render futile any effort of the driver to control the car in an emergency. One of the usual remedies for a prevention of accidents of this description was the tying down of the rear brake so that intruders could not interfere with it. The evidence charges the defendant's superintendent with knowledge that this particular car had had the rear brake tied down at one time so as to prevent mischievous interference therewith. Notice, therefore, of the dangerous condition of the apparatus for stopping the progress of the car in an emergency was brought directly home to the corporation. The public had the right to assume that the ordinary precaution, well known to the company, would be taken to prevent any accident which was liable to happen by reason of the accidental or intentional derangement of the brakes.

The exception taken by the defendant's counsel to the evidence relating to the employment of metallic conveyors of the fares to the money-box in front of the car is not well taken, for the reason, among others, that it was given upon cross-examination of the defendant's witness Brower, the superintendent of the defendant, who had given evidence designed to excuse or extenuate the failure to have a conductor upon this car.

We have examined the several exceptions taken to the charge of the learned judge at the trial, and do not find in them anything that would justify us in interfering with the verdict. The judgment and order appealed from should be affirmed. All concur.